# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of October 11, 2018 (the "Execution Date"), by and between J. Mendel, Inc. a Delaware company ("Mendel" or the "Seller"), Alexandros Group, LLC, a New York limited liability company ("Alexandros"), and JMIP Acquisition LLC, a Delaware limited liability company ("JMIP", and together with Alexandros, the "Purchaser").

WHEREAS, the Seller currently engages in the business of designing, manufacturing and selling (including through retail, wholesale and online sales) apparel for women and offers dresses, gowns, ready to wear apparel, knits, jackets, coats, cuffs, hunter boots and scarves as well as handbags made of luxury leather, fur and alligator (the "Business");

WHEREAS, on June 22, 2018 Mendel (the "Debtor") filed a voluntary petitions for relief, commencing cases (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 11, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court");

WHEREAS, certain loan made by Gores Clothing Holdings, LLC (the "Subordinated Lender") to the Seller, and Seller's other obligations to the Subordinated Lender, pursuant to that certain Second Amended and Restated Term Loan Agreement, dated September 11, 2015, between the Subordinated Lender and the Seller, which loan and other obligations are secured by substantially all of the assets of the Seller, were acquired by the Purchaser, and as such, the Seller is liable to the Purchaser in the amount of not less than $4,000,000 (the "Subordinated Debt");

WHEREAS, the Seller believes, following consultation with its advisors and consideration of available alternatives, that in light of their current circumstances, a sale of the Acquired Assets (as defined below) is necessary to preserve and maximize value, and is in the best interest of Seller and Seller's creditors and stakeholders;

WHEREAS, Purchaser desires to purchase, and Seller desires to sell, convey, assign, transfer and deliver to Purchaser, the Acquired Assets, constituting, with certain exceptions, substantially all of the assets relating to the Business;

WHEREAS, pursuant to that certain Final Order: (I) Authorizing the Use of Cash Collateral and Affording Adequate Protection and (II) Modifying Automatic Stay entered by the Bankruptcy Court in the Bankruptcy Cases on July 14, 2018 (the "Final Cash Collateral Order"), on or before July 29, 2018, the Debtor was required to file a motion (the "Sale Motion") to sell their respective assets on the terms and conditions set forth herein, subject to higher and better offers; and

WHEREAS, the parties desire to consummate the proposed transactions as promptly as practicable after the Bankruptcy Court enters the Sale Order (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

496079-4

# ARTICLE 1

## DEFINITIONS AND RULES OF CONSTRUCTION

**1.1**    **Definitions**.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" means all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business, including, without limitation (a) all cash and cash equivalents; (b) all accounts or notes receivable held by Seller, including all accounts receivables owed to Seller by any subsidiary of Seller, any receivables securing the Seller's obligations to Rosenthal and any rights to receivables sold to Rosenthal which are or will be returned upon payment in full of the Seller's obligations to Rosenthal, and any security, claim, remedy or other right related to any of the foregoing; (c) all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories; (d) all Assumed Contracts; (e) all Intellectual Property; (f) all stock, partnership interests, limited liability company interests and other equity interests in any other entities, including all of Seller's interest in J. Mendel UK, Ltd.; (g) all machinery, equipment, motor vehicles, furniture, computer, fixtures, supplies and materials; and (h) all goodwill and the going concern value of the Business.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Schedules, as the same may be amended or supplemented from time to time in accordance with its terms.

"Assumed Contracts" means the Contracts, if any, set forth on Schedule A attached hereto, as such Schedule may be amended by a Purchase Agreement Supplement.

"Assumed Obligations" means only the obligations arising under the Assumed Contracts, if any, but only to the extent that such liabilities and obligations thereunder are required to be performed after the Closing Date.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Bid Procedures Order" means the Order (i) Approving Bid Procedures for the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (ii) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and (iii) Scheduling an Auction and Sale Hearing, entered by the Bankruptcy Court on August 10, 2018.

2

"<u>Business Day</u>" means a day other than Saturday, Sunday or other day that banks located in New York, New York are authorized or required by Law to close.

"<u>Chapter 11 Cases</u>" means the cases commenced by JM Holding Group, LLC and Mendel under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court including to the extent converted to a case under chapter 7 of the Bankruptcy Code.

"<u>Claim</u>" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under Contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral.

"<u>Copyrights</u>" means any and all rights in any works of authorship, including (A) copyrights and moral rights, (B) copyright registrations and recordings thereof and all applications in connection therewith including those listed on Schedule 1.1, (C) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of Seller's rights corresponding thereto throughout the world.

"<u>Cure Payments</u>" means any cure payment or obligations (pursuant to section 363 or 365 of the Bankruptcy Code) due by Seller, and which would be required by the Bankruptcy Court to be made or assumed by Purchaser, in order to cure any default with respect to Seller's Contracts,.

"<u>Dollars</u>" or "<u>$</u>" means dollars of the United States of America.

"<u>Excluded Assets</u>" means any asset set forth on <u>Schedule B</u> attached hereto, as such Schedule may be amended by a Purchase Agreement Supplement.

"<u>Governmental Authority</u>" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"<u>Intellectual Property</u>" means any and all Patents, Copyrights, Trademarks, trade secrets, know-how, brands, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs, websites, webpages and domain names, email addresses and telephone numbers, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

496079-4

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including, without limitation, any liability for Taxes.

"Lien" or "Liens" means any charge, claim, lien, option, encumbrance, mortgage, pledge, security interest, conditional sale agreement or other title retention agreement, lease, security agreement, right of first refusal, option, restriction, tenancy, license, covenant, right of way, easement or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or statute or Law of any jurisdiction) on property.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Patents" means patents and patent applications, including (i) the patents and patent applications listed on Schedule 1.1, (ii) all provisionals, continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (iii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iv) the right to sue for past, present and future infringements thereof, and (v) all of Seller's rights corresponding thereto throughout the world.

"Permits" means all certificates, permits, authorizations, filings, approvals and licenses possessed by Seller, or through which Seller has rights, that are used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Petition Date" shall mean June 22, 2018.

"Purchase Agreement Supplement" means that certain Supplement to Asset Purchase Agreement in substantially the form attached hereto as Exhibit A attaching (1) Schedule A, consisting of a list of Assumed Contracts, if any, and setting forth any Cure Payment owing with respect to each Assumed Contract and (2) Schedule B, listing all Excluded Assets to be delivered by Purchaser to Seller.

"Rosenthal" means Rosenthal & Rosenthal, Inc.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

Sale Motion" means that certain motion dated July 23, 2018 of the Debtor Seeking the Entry of (I) an Order (A) Establishing Bidding Procedures For The Sale of Assets, (B) Authorizing the Debtor to Select a Stalking Horse Bidder, (C) Scheduling an Auction and Sale Hearing, and (D) Approving the Form and Manner of Notice Thereof; And (II) An Order Authorizing and Approving (A) Debtor's Entry Into a Certain Asset Purchase Agreement, (B) The Sale of Assets Free and Clear of Liens and Other Interests, and (C) Assumption and Assignment of Certain Executory Contracts and Leases.

"Sale Order" means an order entered by the Bankruptcy Court substantially in the form attached to the Sale Motion as Exhibit "C" authorizing Mendel to sell the Acquired Assets to Purchaser, and the assumption by Seller and the assignment to Purchaser of the Assumed Contracts, pursuant to this Agreement and sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests other than the Assumed Obligations, and authorizing the other transactions contemplated by this Agreement.

"Schedules" means the schedules attached hereto or attached to the Purchase Agreement Supplement.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person all federal, state, local, county, foreign and other taxes, charges, fees, duties, customs, levies and other assessments, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), abandoned property, escheat, environmental or windfall profit tax, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by the Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Trademarks" means any and all trademarks, trade names used in commerce by Seller, registered trademarks, trademark applications, service marks, registered service marks, service mark applications, trade dress, registered trade dress, and pending trade dress applications, including (i) the trade names, registered trademarks, trademark applications, registered service marks, service mark applications, trade dress, registered trade dress and pending trade dress applications listed on Schedule 1.1, (ii) all renewals thereof, (iii) all rights and consents to register any trademarks, service marks, or trade dress comprising or containing the "J. Mendel" name or brand and any derivations thereof, (iv) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (v) the right to sue for past, present and future infringements and dilutions thereof, (vi) the goodwill of Seller's business symbolized by the foregoing or connected therewith and (vii) all of Seller's rights corresponding thereto throughout the world.

"Transaction Documents" means this Agreement, the Bill of Sale (as defined in **Section 3.2**), any Assignment and Assumption Agreements (as defined in **Section 3.2**) and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

**1.2**    **Rules of Construction**.  Unless the context otherwise clearly indicates, in this Agreement, (a) the singular includes the plural, (b) "includes" and "including" are not limiting, (c) "may not" is prohibitive and not permissive; and (d) "or" is not exclusive.

## ARTICLE 2

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

**2.1**    **Purchase and Sale of Acquired Assets**.  On the terms and subject to the conditions set forth in this Agreement, and as modified on the record at the auction sale on October 11, 2018, at the Closing, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in Section 2.3, all of the Acquired Assets, free and clear of all Liens, Claims and interests other than the Assumed Obligations.

**2.2**    **Assignment and Assumption of Assumed Obligations**.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Purchaser shall assume from the Seller, and thereafter be solely responsible for the payment, performance or discharge, of only the Assumed Obligations.  Purchaser will not assume or have any responsibility, however, with respect to any other Liability not included within the definition of Assumed Obligations, including any Liabilities related to (a) Taxes, (b) the employment (or the termination of employment) of any employees of Seller, (c) claims of any customer or vendor of Seller other than pursuant to an Assumed Contract, (d) claims of any landlord of Seller (except to the extent the lease with such landlord is an Assumed Contract), (e) the non-Business related activities of the Seller, or (f) the operation of the Business or the Acquired Assets prior to the Closing.

**2.3**    **Consideration**.  The aggregate consideration for the Acquired Assets at the Closing shall be (a) cash payment of $4,500,000.00, plus (b) a reduction in the Subordinated Debt by the amount of $1,500,000; plus (c) the Cure Payments, if any, plus (d) assumption of the Assumed Obligations, if any.  Consideration pursuant to this **Section 2.3** shall be allocated among the assets purchased in consultation among the Purchaser and Seller).

**2.4**    **Purchase Agreement Supplement**.  No later than one (1) Business Days prior to the date of the auction (the "**Auction**"), Purchaser may amend **Schedule A** or **Schedule B** attached hereto by delivering to Seller a Purchase Agreement Supplement setting forth such amendments to such Schedules.

**2.5**    **Obligations in Respect of Assumed Contracts**.  To the extent that any Assumed Contract is subject to a cure amount pursuant to sections 363 or 365 of the Bankruptcy Code or otherwise, immediately after the Closing, Purchaser shall directly pay or otherwise provide for the amount of any applicable Cure Payment limited to and set forth on **Schedule A** and shall not be

entitled to seek indemnification or contribution from the Seller.  The Seller in no way shall be liable for any Cure Payment.

## ARTICLE 3

## CLOSING

**3.1**    **Closing**.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Seller's counsel (or such other location as agreed to by the parties in writing), prevailing local time, no later than the first Business Day after the date on which the conditions set forth in ARTICLE 7 and ARTICLE 8 have been satisfied or waived; or on such other date or place as Purchaser and the Seller may determine (the "Closing Date") but, in no event, later than two (2) business days after entry of the Sale Order unless such Closing Date is extended upon mutual agreement of Seller, Purchaser and upon written consent of Rosenthal

**3.2**    **Deliveries by Seller**.  At the Closing, Seller shall deliver or procure delivery to Purchaser of:

(a)    a bill of sale with respect to the Acquired Assets, in form and substance satisfactory to Purchaser (the "Bill of Sale"), duly executed by Seller;

(b)    such assignments and other good and sufficient instruments of assumption and transfer, prepared by the Purchaser, in form reasonably satisfactory to Seller and duly executed by Seller, as the Purchaser may reasonably request to transfer and assign the Acquired Assets and any Assumed Contracts to Purchaser, including without limitation any agreements, certificates or filings necessary to, or reasonably requested by Purchaser to, effectuate the transfer of all Intellectual Property to Purchaser free and clear of all Liens, Claims and interests (the "Assignment and Assumption Agreements");

(c)    all books, records, trade secrets or business methods included in Acquired Assets (provided that with respect to electronically stored information, the Seller and Purchaser will cooperate in downloading such information and importing the same on to Purchaser's system at Purchaser's cost) Purchaser shall permit continued access to the Seller's books and records in accordance with Section 6.2;

(d)    a copy of the Sale Order;

(e)    duly executed statutory and regulatory consents and approvals which are required under the laws or regulations of the United States and other Governmental Authorities, and all other necessary consents and approvals of third parties or Affiliates of the Seller to the transactions contemplated hereby which are prepared by or provided to Seller by Purchaser;

(f)    all other agreements, records and other documents required by this Agreement; and

7

(g)     all such other instruments of conveyance and related affidavits prepared by Purchaser, as shall, in the reasonable opinion of Purchaser, be necessary to vest in Purchaser good, valid and marketable title to the Acquired Assets.

**3.3** **Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to Seller and, to the extent directed by Seller, to Rosenthal, the following: (a) any Assignment and Assumption Agreements, duly executed by Purchaser, (b) the cash portion of the consideration, and (c) any instrument reasonably necessary to evidence the Purchaser's reduction of the outstanding Subordinated Debt pursuant hereto.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as of the Execution Date and as of the Closing Date as follows:

**4.1** **Organization and Standing**. Seller is duly incorporated or organized, as applicable, validly existing and in good standing under the Laws of the jurisdiction of its formation or organization and is qualified or licensed to do business in each jurisdiction in which the Acquired Assets are located to the extent such qualification is necessary. Seller has all Permits necessary to own and operate the Acquired Assets and to carry on the Business as it was conducted by it prior to the Petition Date.

**4.2** **Authorization and Power**. Subject to any necessary authorization from the Bankruptcy Court, Seller has all requisite power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder. All Transaction Documents to which Seller is a party have been duly executed and delivered by Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered after the date hereof, in which case such Transaction Documents will be duly executed and delivered at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court with respect Seller. All Transaction Documents to which Seller is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against the Seller in accordance with their terms.

**4.3** **Conflicts; Consents**.

(a)     The execution, delivery and performance by Seller of this Agreement and the consummation of the transaction contemplated hereby, and compliance by Seller with any of the provisions hereof, do not result in the creation of any Lien upon the Acquired Assets and do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of: (i) Seller's certificate of formation or organization, limited liability company agreement or comparable organizational documents; (ii) subject to entry of the Sale Order with respect to Seller, any Assumed Contract to which Seller is a party or by which any of the Acquired Assets are bound; (iii) subject to entry of the Sale Order with respect to Seller, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or

8

any of the Permits, licenses, rights, properties or assets of Seller as of the date hereof; or (iv) subject to entry of the Sale Order with respect to Seller, and any applicable Law.

(b)    Subject to entry of the Sale Order with respect to Seller, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.4    **Title to Assets**. Seller has good, valid, and undivided title to the Acquired Assets that are owned by Seller. Subject to Bankruptcy Court approval with respect to Seller, Seller has the power and the right to sell, assign and transfer, and Seller will sell and deliver to Purchaser, and Purchaser will be vested with good, valid, and undivided title to, the Acquired Assets that are owned by Seller, free and clear of all Claims and Liens (as of the Closing Date) except for the Assumed Obligations (including any Cure Payments). Purchaser acknowledges that the Acquired Assets are being sold AS IS, WHERE IS without any representations or warranties other than those expressly provided in Article 4 of the Agreement.

4.5    **Assumed Contracts**. Except for defaults that will be cured through the Cure Payments to be listed on Schedule A to the Purchase Agreement Supplement or defaults arising solely as a consequence of the commencement of the Chapter 11 Case, Seller is not in default or breach in any material respect under the terms of any Assumed Contract. Each Assumed Contract is in full force and effect. The Seller has delivered to Purchaser true, complete and correct copies of each Assumed Contract. The Cure Payments set forth on Schedule A to the Purchase Agreement Supplement are Seller's good faith estimate of all of the Cure Payments to be satisfied by Purchaser for purposes of Seller's assumption and assignment to Purchaser of the Assumed Contracts under section 365 of the Bankruptcy Code.

4.6    **Acknowledgement**. Seller hereby acknowledges that Alexandros is the record and beneficial owner of 50% of the membership interest of JM Holding Group, LLC, the parent company of Seller, and that the managers and officers of both Alexandros and JMIP are the officers or JM Holding Group, LLC and Seller.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Seller as of the Execution Date and as of the Closing Date as follows:

5.1    **Organization, Standing and Power**. Alexandros is a New York limited liability company organized, validly existing and in good standing under the Laws of the state of its organization. JMIP is a Delaware limited liability company organized, validly existing and in good standing under the Laws of the state of its organization.

9

**5.2**    **Authorization**.  Purchaser has all requisite power and authority to own, lease and operate its properties, and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  All Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Purchaser after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Purchaser at or prior to the Closing, and all Transaction Documents to which Purchaser is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

**5.3**    **No Conflict or Violation**.  Except to the extent unenforceable due to operation of applicable bankruptcy Law or the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not violate any Law or any provision of the charter or organizational documents of Purchaser.

**ARTICLE 6**

**COVENANTS OF PURCHASER AND SELLER; OTHER AGREEMENTS**

**6.1**    **Access**.  Seller shall, prior to the Closing Date, (a) provide Purchaser and its representatives and agents, upon reasonable written notice and at reasonable times, access to, or arrange access to, the facilities, offices, warehouses and any other locations where inventory is maintained, personnel, professionals, customers and suppliers of the Seller and to all books, records and lists of the Seller relating to the Acquired Assets, including, without limitation, (i) all records relating to customers, suppliers or personnel of the Seller (including, without limitation, customer and mailing lists) and (ii) all books, ledgers, files, reports, plans, drawings and operating records of the Seller; (b) furnish Purchaser with such financial and operating data and other information with respect to the Business and the Acquired Assets as Purchaser shall reasonably request without any express or implied representations or warranties as to accuracy or completeness; (c) permit Purchaser to make such reasonable inspections of the Seller's assets as Purchaser may require; and (d) facilitate discussions between Purchaser and the Seller's customers, suppliers and other parties with whom the Seller conducts business.

**6.2**    **Further Assurances**.

(a)    From time to time after the Closing, and without further consideration, Seller, (i) upon the reasonable request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (ii) subject to the Sale Order, Purchaser, upon the reasonable request of Seller, shall execute and deliver such documents and instruments of contract assumption as the Seller may reasonably request in order to confirm Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the

transactions contemplated by this Agreement. After the Closing, Purchaser agrees to provide the Seller or any fiduciary acting on behalf of the Seller, upon reasonable request, access to accounts, books and records relating to the conduct of the Business prior to the Closing.

(b)     If, following Closing, Seller becomes aware that it owns any asset or right other than an Excluded Asset, the Seller shall promptly inform the Purchaser of that fact. Thereafter, at the request of Purchaser, the Seller shall execute such documents as may be reasonably necessary to cause the transfer of, and the Seller shall transfer, any such asset or right to the Purchaser or its designee for no additional consideration and the Seller shall do all such things as are reasonably necessary to facilitate such transfer. If, following the Closing, Seller receives any payments in respect of the Acquired Assets, such payments shall be deemed to be held in trust for the benefit of the Purchaser and the Seller shall promptly remit such payments to the Purchaser.

(c)     With respect to any Acquired Asset for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, without limiting Seller's obligations under Section 3.2 above, Seller shall deliver to the Purchaser a power of attorney in a form satisfactory to the Seller and Purchaser, to provide Purchaser with all of the benefits of, or under, the applicable Acquired Asset.

**6.3    Bankruptcy Actions.**

(a)     The Seller shall use commercially reasonable efforts to obtain the entry of the Sale Order as soon as practicable and no later than October 17, 2018.

(b)     Subject to its obligations as a Debtor-in-Possession, Seller shall promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

(c)     With respect to each Assumed Contract, to the extent required by the Bankruptcy Court, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract by Purchaser.

(d)     The Purchaser shall take such actions as may be reasonably requested by the Seller to assist the Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(e)     The Seller shall give notice to all parties entitled to notice of the Bid Procedures Order, the Sale Order and any motions related thereto, including the Sale Motion, in accordance with all applicable Laws, the Rules and any applicable local rules, and to any other Persons reasonably requested by Purchaser.

(f)     The Seller shall promptly notify Purchaser if any party objects to the Sale Motion, the Bid Procedures Order or the Sale Order and provide Purchaser a copy of any related notices, applications or motions after receipt by the Seller.

11

**6.4    Sale Procedures**. Notwithstanding anything to the contrary in this Agreement, the following terms and conditions shall govern:

(a)    The sale of the Acquired Assets to the Purchaser, the approval of this Agreement and the consummation of the transactions contemplated hereby are expressly subject to the Bid Procedures Order and entry of the Sale Order by the Bankruptcy Court.

(b)    The Purchaser shall have the right, in its sole discretion, to increase its credit bid for the Acquired Assets up to the amount of the remaining Subordinated Debt.

(c)    This Agreement shall be subject to higher and better offers from competing bidders to be submitted in accordance with the terms and conditions of the Bid Procedures Order.

(d)    The Seller, at its own cost, shall cooperate with the Purchaser in resolving or contesting any objections (including testimony or argument in Bankruptcy Court) to this Agreement or the Sale Order.

(e)    The Purchaser shall be responsible for providing adequate assurance of future performance necessary for the assumption and assignment of the Assumed Contracts.

**6.5    Schedules, Disclosures and Supplements**.  The Seller shall notify Purchaser in writing of, and shall supplement the Schedules to this Agreement with respect to, any matter that (a) arises after the Execution Date but prior to the Closing and that, if existing or occurring at or prior to the Execution Date, would have been required to be set forth or described in the Schedules to this Agreement or the disclosures required pursuant to Section 6.2 hereof or (b) makes it necessary to correct any information in the Schedules to this Agreement or in the disclosures required pursuant to Section 6.2 hereof or in any representation and warranty of any Seller that has been rendered inaccurate thereby.  Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof.  None of such supplements to the Schedules or the disclosures required pursuant to Section 6.2 hereof shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement with respect to satisfaction of the conditions set forth in Section 7.1 or otherwise affect any other term or condition contained in this Agreement.

**6.6    Conduct of Business Prior to Closing**.  Except as expressly contemplated by this Agreement or with Purchaser's prior written consent, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(a)    The Seller shall not, and cause its subsidiaries to not, directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than as required in the ordinary course of business;

(b)    The Seller shall not, and shall cause its subsidiaries to not, permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim or other encumbrance except as may be provided in the Interim and Final Cash Collateral Order entered by the Bankruptcy Court in the Debtor's Chapter 11 proceeding;

(c)     The Seller shall, and shall cause its subsidiaries to, take all commercially reasonable actions necessary to maintain any trademark, patent, industrial design and copyright registrations and any applications therefore that are pending anywhere in the world as of the Execution Date;

(d)     The Seller shall not, and shall cause its subsidiaries to not, enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by any Seller in this Agreement;

(e)     The Seller shall, and shall cause its subsidiaries to, comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset;

(f)     The Seller shall not, and shall cause its subsidiaries to not, assume, amend, modify, terminate or reject any Contract to which any Seller is a party or by which it is bound and that is exclusively used in or related to the Business or the Acquired Assets (including any Assumed Contract) without Purchaser's consent;

(g)     The Seller shall not, and shall cause its subsidiaries to not, cancel or compromise any material debt or claim or waive or release any right of any Seller that constitutes an Acquired Asset; and

(h)     The Seller shall not, and shall cause its subsidiaries to not, acquire any assets from any Person other than in the ordinary course of business.

**6.7     Refunds and Remittances**.  If Seller or any of its Affiliates, on the one hand, or the Purchaser or any of its Affiliates, on the other hand, after the Closing Date receives any funds properly belonging to the other party in accordance with the terms of this Agreement, the receiving party will promptly so advise such other party and will promptly deliver such funds to an account or accounts designated in writing by such other party.

**6.8     Privacy Policy**.  Purchaser hereby agrees to abide by the Seller's privacy policy as in place as of the Execution Date.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are subject to satisfaction, or waiver at the option of Purchaser, of the following conditions precedent on or before the Closing Date.

**7.1     Representations and Warranties; Covenants**.

(a)     Each of the representations and warranties of the Seller contained herein that are qualified by materiality must be true and correct in all respects on and as of the Execution Date and on and as of the Closing Date, and each such representations and warranties not qualified by materiality must be true and correct in all material respects on and as of the Execution Date and on and as of the Closing Date, (except, in each case, for representations and warranties made as of

13

a specified date, which must be true and correct in all respects (or all material respects, as applicable), as of that date).

(b)    The Seller shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by the Seller on or prior to the Closing Date.

**7.2    Assumed Contracts**.  The Seller shall have delivered to Purchaser copies of each of the Assumed Contracts.

**7.3    Bankruptcy Court Approval**.  Each of the Bid Procedures Order and Sale Order shall have been entered by the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser.

**7.4    No Proceedings**.  No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to appeal.

**7.5    Closing Deliveries**.  The Seller shall have delivered to Purchaser all of the closing deliveries set forth in Section 3.2.

## ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of the Seller under this Agreement are subject to satisfaction, or waiver at the option of the Seller, of the following conditions precedent on or before the Closing Date.

**8.1    Representations and Warranties; Covenants**.  The representations and warranties of Purchaser contained herein must be true and correct in all material respects on and as of the Execution Date and on and as of the Closing Date, (except, in each case, for representations and warranties made as of a specified date, which must be true and correct in all material respects, as of that date).

**8.2    Bankruptcy Court Approval**.  The Sale Order shall have been entered by the Bankruptcy Court.

**8.3    No Proceedings**.  No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to appeal.

**8.4    Closing Deliveries**.  Purchaser shall have delivered to the Seller the other closing deliveries set forth in Section 3.3.

## ARTICLE 9

## TERMINATION; TERMINATION PAYMENT

**9.1**    **Termination**. This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and the Seller, with the written consent of Rosenthal and consultation with Gores;

(b)    automatically and without any action or notice by the Seller to Purchaser, or Purchaser to Seller, and immediately upon the entry thereof, if there shall be in effect a statute, rule, regulation, non-appealable judgment, decree, injunction or other order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated under this Agreement;

(c)    by either Purchaser or the Seller (with the written consent of Rosenthal in consultation with Gores) (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach would give rise to the failure of the condition set forth in Section 7.1 or Section 8.1, as applicable, and such breach is not cured within ten (10) days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d)    by Purchaser if the Sale Order shall not have been entered on or before October 17, 2018, unless such date is extended by Seller with the written consent of Rosenthal in consultation with Gores;

(e)    by Purchaser or the Seller if the closing has not occurred within (2) business days after the entry of the Sale Order,  if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Seller in writing), provided that the right to terminate this Agreement under this Section 9.1(e) shall not be available to a party if its failure to fulfill any obligation under this Agreement has been a significant cause of, or resulted in, the failure of the Closing on or before such date;

(f)    by Purchaser, if, prior to the Closing the Chapter 11 Case of Seller shall have been converted to a case under chapter 7 of the Bankruptcy Code;

(g)    by Purchaser, if there shall be excluded from the Acquired Assets any Assumed Contracts that are not assignable or transferable under the Bankruptcy Code or otherwise without the consent of any person other than Seller, to the extent such consent shall not have been given prior to the Closing and such Assumed Contracts shall, in the opinion of Purchaser in its sole discretion, prevent it from effectively operating the Business; or

(h)    by the Seller (provided that the Seller is not in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in ARTICLE 8 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied).

**9.2** **Effect of Termination or Breach**.  If the transactions contemplated hereby are not consummated:  (a) this Agreement shall become null and void and of no further force and effect, except (i) for this Section 9.2, (ii) for the provisions of Sections 11.1, 11.7, 11.8, 11.9, 11.10 and 11.12 hereof, and (iii) that the termination of this Agreement for any cause shall not relieve any party hereto from any Liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination.

## ARTICLE 10

## ADDITIONAL POST-CLOSING COVENANTS

**10.1** **Joint Post-Closing Covenant of Purchaser and Seller**.  Purchaser and Seller jointly covenant and agree that, from and after the Closing Date, Purchaser and Seller (so long as such Seller has any employees or officers with knowledge of the Business) will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of an audit of any Tax Return of Seller or Purchaser relating to the Business for all periods prior to or including the Closing Date and (b) any audit of Purchaser and/or any audit of Seller with respect to the sales, transfer and similar Taxes imposed by the Laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement.  In furtherance hereof, Purchaser and Seller further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel, if any are so employed, in connection therewith.  All costs and expenses incurred in connection with this Section 10.1 referred to herein shall be borne by the party who is subject to such action.

**10.2** **Tax Matters**.

(a) Any use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Purchaser other than Seller's obligation to pay its own sales, income and/or capital gain taxes arising from the transaction contemplated by this Agreement, and Purchaser shall indemnify, defend (with counsel reasonably satisfactory to Seller), protect, and save and hold the Seller harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b) Purchaser shall, within the later of (i) 120 days after the Closing Date or (ii) 30 days prior to the date by which the Seller' federal income Tax Returns must be filed, prepare and deliver to the Seller a schedule allocating the consideration set forth in Section 2.3 among the Acquired Assets (such schedule, the "Allocation").  Purchaser and the Seller shall report and file all Tax Returns consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding).  Purchaser and the Seller shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such

Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the consideration set forth in Section 2.3. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 10.2(b) shall survive the Closing without limitation.

10.3    **Name Change**. From and after the closing of this Agreement, the Seller shall no longer use or have any rights to the name "J. Mendel" or any derivate thereof. Furthermore, Seller agrees to change its name for all purposes, including the case name for these Chapter 11 Cases, within ten (10) days after the closing of this Agreement to remove the name "J. Mendel".

## ARTICLE 11

## MISCELLANEOUS

11.1    **Expenses**.

(a)    Each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

(b)    The parties hereto agree that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or the Seller in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify (with counsel reasonably satisfactory to the party or parties entitled to indemnification) and hold the other harmless from and against any and all such claims or demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

11.2    **Amendment**. This Agreement may not be amended, modified or supplemented except by a written instrument signed by the Seller and Purchaser.

11.3    **Notices**. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, e-mail, or other wire transmission, (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service, or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid. Unless another address is specified in writing, any notice, request, instruction or other documents given to the parties to this Agreement shall be sent to the addresses indicated below:

To Purchaser:

Alexandros Group, LLC
36-20 34th Street
Long Island City, NY 11106

17

496079-4

Attention: Ioannis Georgiades
Email: john@stallionnyc.com

With a copy to:  Silverman Shin & Byrne PLLC
Wall Street Plaza
88 Pine Street, 22nd Floor
New York, NY 10005
Attention: John Shin
Email: jshin@silverfirm.com

To Seller:  J. Mendel Inc. DIP
36-20 34th Street
Long Island City, NY 11106
Attention: James Charles
Email: jim@stallionnyc.com          ]

With a copy to:  Platzer, Swergold, Levine, Goldberg, Katz & Jaslow, LLP
475 Park Avenue South, 18th Floor
New York, New York 10016
Attention:    Clifford A. Katz
Email: ckatz@platzerlaw.com

**11.4   Waivers.**  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by the Seller or Purchaser, as applicable, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**11.5   Counterparts and Execution.**  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature or ".pdf" format signature and such signature shall be deemed an original.

**11.6   Headings.**  The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**11.7   SUBMISSION TO JURISDICTION.**  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

**11.8** **Governing Law; Jurisdiction**. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Mendel is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court for the Eastern District of New York. After Mendel is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in the State of New York.

**11.9** **Binding Nature; Assignment**. Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed), except: (a) Purchaser may transfer and assign this Agreement and the rights, interest and obligations hereunder, or any portion thereof, (i) to one or more of its Affiliates, (ii) in connection with a sale of all or substantially all of its assets or all or substantially all of the assets comprising the Business, or (iii) for collateral security purposes to any lender providing financing to the Purchaser or any of its Affiliates; and (b) as otherwise provided in this Agreement. The Seller hereby agree that upon entry of the Sale Order the terms of this Agreement shall be binding upon trustee appointed under Chapter 7 of the Bankruptcy Code.

**11.10** **No Third Party Beneficiaries**. This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

**11.11** **Construction**. The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local or foreign Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.

**11.12** **Entire Understanding**. This Agreement and the Schedules, the Bid Procedures and the Sale Order set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement and the Schedules, Bid Procedures and Sale Order supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

**11.13** **Closing Actions**. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

19

**11.14  Conflict Between Transaction Documents**.  The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Document referred to herein (other than the Sale Order), this Agreement shall govern and control.

**11.15  No Survival**.  The representations and warranties of each Seller and Purchaser contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing, other than in the case of fraud.

**11.16  Specific Performance**.  It is understood and agreed by Purchaser and Seller that money damages would be an insufficient remedy for any breach of this Agreement by Purchaser or Seller and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, and notwithstanding anything herein to the contrary, Seller and Purchaser shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring the Purchaser and the Seller to comply promptly with all of their respective obligations hereunder.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

496079-4

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered on the date first above written.

PURCHASER:

**ALEXANDROS GROUP, LLC**

By_____
   Name:  Ioannis Georgiades
   Title:  President

**JMIP ACQUISITION LLC**

By_____
   Name:  Ioannis Georgiades
   Title:  President

SELLER:

**J. Mendel Inc.**

By_____
   Name: IOANNIS GEORGIADES
   Title:  PRESIDENT.

## Schedule 1.1

Intellectual Property

[See Attached]

## Schedule A

Assumed Contracts

1.    Lease Agreement, dated July 1999, by and between Seller and Bergdorf Goodman, Inc., as amended.  Cure Amount - $0

2.    Each agreement between Debtor and a customer of Seller for the storage of fur.   Cure Amount - $0

3.    Each agreement between Debtor and a customer of Seller for the repair and servicing of fur.  Cure Amount - $0.

## Schedule B

Excluded Assets

All leasehold improvements located at 787 Madison Avenue, New York, New York.

## EXHIBIT A

## FORM OF PURCHASE AGREEMENT SUPPLEMENT

## SUPPLEMENT TO ASSET PURCHASE AGREEMENT

Reference is made to that certain Asset Purchase Agreement (the "Purchase Agreement") entered into as of October __, 2018, by and among J. Mendel Inc., a Delaware company ("Mendel"), (the "Seller"), Alexandros Group, LLC, a New York limited liability company, and JMIP Acquisition LLC, a Delaware limited liability company ("JMIP", and together with Alexandros, the "Purchaser"). Capitalized terms used but not defined herein shall have the respective meanings assigned to such terms in the Purchase Agreement.

Pursuant to Section 2.4 of the Purchase Agreement, Purchaser hereby delivers to Seller the attached amended and restated schedules, constituting (A) the amended and restated list of Assumed Contracts and applicable Cure Payments and (B) the amended and restated list of Excluded Assets. Each schedule attached hereto shall be deemed to be a part of the Purchase Agreement from and after the date hereof.

**PURCHASER:**

**ALEXANDROS GROUP, LLC**

By_____
    Name:
    Title:

**JMIP ACQUISITION LLC**

By_____
    Name:
    Title:

## Schedule A

Assumed Contracts

[See Attached]

496079-4

## Schedule B

Excluded Assets

[See Attached]

496079-4